# United States Court of Appeals
## For the First Circuit

---

No. 00-9010

IN RE: ROBERT T. SPIGEL

Debtor

---

GLENN MCCRORY & ANN MCCRORY,

Plaintiffs, Appellants,

v.

ROBERT T. SPIGEL,

Defendant, Appellee.

---

APPEAL FROM THE BANKRUPTCY APPELLATE PANEL

OF THE FIRST CIRCUIT

---

Before

Lynch, <u>Circuit Judge</u>,

Bownes, <u>Senior Circuit Judge</u>,

and Lipez, <u>Circuit Judge</u>.

---

<u>James A. Currier</u> for Appellants.
<u>Marty C. Marran</u> for Appellee.

August 13, 2001

**LIPEZ, Circuit Judge**.   Glenn and Ann McCrory appeal from the judgment of the Bankruptcy Appellate Panel (BAP) reversing the bankruptcy court and holding that the debt owed them by Robert Spigel as a result of a Rhode Island Superior Court judgment was not exempt from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).  The McCrorys claim that the collateral estoppel effect of the Superior Court judgment creating the debt establishes that Spigel committed fraud in a transaction related to that debt, and hence that debt should be exempt from discharge.  The BAP disagreed, concluding that the Superior Court did not find that Spigel engaged in fraud, thereby precluding reliance on collateral estoppel.  We disagree with the BAP's analysis because the Superior Court judgment reflected findings that Spigel engaged in fraudulent conduct.  However, that judgment did not establish a sufficient link between Spigel's fraudulent conduct and the debt Spigel owes the McCrorys to allow an exception to discharge under § 523(a)(2)(A) on the basis of collateral estoppel. Consequently, we affirm for a different reason.

## I.

The facts in this case are drawn from the judgment and record of the Rhode Island Superior Court. The McCrorys are owners of an unincorporated business, Frenchtown Auto Sales, that services and sells automobiles in North Kingstown, Rhode Island. At some point prior to the events at issue here, the McCrorys entered into a verbal agreement

-3-

with Spigel concerning Frenchtown's business. First, the McCrorys wanted an independent contractor to perform all of their service work. Spigel formed a corporation called A Smiling Mr. Bob Enterprises, Inc. (Smiling Mr. Bob), and the McCrorys agreed to have that corporation service automobiles at the Frenchtown lot. Second, the McCrorys hired Spigel individually as a sales agent. Under Rhode Island law, an individual can only sell six cars per year. To sell more, a special license is required. Spigel did not have the requisite license, so the McCrorys extended to him the authority to use their license to sell and buy cars, provided that Spigel did so either at auctions or on the Frenchtown lot.

The transaction that underlies the debt at issue here began when Spigel received a phone call from a nephew who sold cars in New York. This nephew had three cars with New Jersey titles that he wished Spigel to sell for him. Spigel took delivery of the cars and sold all three, one to Tarbox Motors and two to Apollo Auto Sales. Both buyers were Rhode Island dealers. Spigel used the McCrorys' license number to authorize all three sales, even though none of the sales were conducted in accordance with the limited grant of authority given to him by the McCrorys. The sales did not occur at auction or on the Frenchtown lot.

Although Spigel claimed that he had called an unidentified police officer to run the cars' vehicle identification numbers (VIN's)

-4-

to ensure their legitimacy, the cars were, in fact, stolen.[1] Apollo discovered this problem soon after the sale, when it performed its own check of the VIN's. Informed of the problem, Spigel refunded the purchase price of both cars and then called Tarbox to stop any sale of the car he had sold them. Spigel did not, however, refund the purchase price to Tarbox or take any other action to reimburse Tarbox, apparently lacking the funds to do so. Tarbox submitted a claim to its insurer for the loss associated with the stolen car. The insurer paid the claim and then, rather than suing Spigel for the loss, proceeded before the Rhode Island Motor Vehicles Dealers Commission to get reimbursement from the McCrorys through Spigel's use of the McCrorys' license to sell a stolen car. Before the commission contacted them concerning this complaint, the McCrorys had not known of Spigel's sales to Tarbox and Apollo. The McCrorys claimed, in their defense, that Spigel had acted on his own. The commission rejected this defense and ordered the McCrorys to reimburse Tarbox's insurer the $18,000 purchase price that Tarbox had paid Spigel for the car.[2]

After working out an arrangement to pay Tarbox's insurer, the McCrorys instituted an action against Spigel in the Rhode Island

---

[1]     At some point following the events described here, Spigel's nephew was incarcerated. It is not clear from this record whether that incarceration was related to the sale of the stolen vehicles.

[2]     The record does not reveal the precise basis of the commission's ruling.

Superior Court. In due course, the McCrorys filed a motion for summary judgment seeking to ground the liability of Spigel on a theory of equitable indemnification. Although the Superior Court found that both Spigel and the McCrorys were liable to Tarbox, it also concluded that Spigel had, through a transaction that failed to "bear any indicia of legitimacy," been entirely at fault in causing Tarbox's loss. The court noted the cars' illicit background and Spigel's unauthorized use of the McCrorys' Rhode Island auto sales license. The cars' New Jersey titles had obvious misspellings and two of the titles, though "with two different previous owners," had the same control number.[3] Spigel also listed Frenchtown on the back of the titles as the buyers of the vehicles, even though Frenchtown had no involvement at all with the cars. Moreover, Spigel created a new Bill of Sale designed to further the false impression that he was acting as agent for Frenchtown. This Bill of Sale bore the heading "Specializing in high quality one owner reconditioned vehicles. You just made a great deal. A Smiling Mr. Bob Enterprises, Incorporated d/b/a Frenchtown Auto Sales."[4] In contrast to the opprobrium it directed at Spigel, the court found that the

---

[3]   Spigel claimed that he had not noticed the similar control numbers because he had not had the titles at the same time.

[4]   The McCrorys did not see this Bill of Sale until it was shown to them by the State Police as part of its investigation into the Tarbox sale.

McCrorys were blameless. Consequently, the court ordered Spigel to indemnify the McCrorys for the money they paid to Tarbox's insurer.

Spigel appealed to the Rhode Island Supreme Court. During the pendency of that appeal, Spigel filed for bankruptcy. The McCrorys responded with the present adversary proceeding, seeking to have the debt created by the Superior Court judgment deemed nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). The bankruptcy court stayed the proceeding pending the Rhode Island Supreme Court's decision. Shortly after the Supreme Court affirmed, Spigel and the McCrorys filed cross-motions for summary judgment in the bankruptcy court, agreeing that the court should take judicial notice of the decision and record in the Rhode Island courts. In a terse order, the bankruptcy court granted the McCrorys' motion and denied Spigel's, thereby ruling that Spigel's debt to the McCrorys was nondischargeable. Spigel appealed to the BAP, which reversed and ordered judgment in favor of Spigel. The McCrorys now appeal.

## II.

A motion for summary judgment in an adversary proceeding under § 523(a)(2)(A) to have a debt declared nondischargeable is governed by the same standards applicable to motions under Fed. R. Civ. P. 56. Fed. R. Bankr. P. 7056. In reviewing the application of those standards by the bankruptcy court, we apply "the same regimen that the intermediate appellate tribunal must use, [while] exhibit[ing] no

particular deference to the conclusions of that tribunal (be it the district court or the BAP)." In re Healthco Int'l, Inc., 132 F.3d 104, 107 (1st Cir. 1997). Consequently, we review the grant of summary judgment de novo. Stoehr v. Mohamed, 244 F.3d 206, 208 (1st Cir. 2001); In Re I Don't Trust, 143 F.3d 1, 3 (1st Cir. 1998) ("In an appeal from a bankruptcy court decision, this court--like the district court or the bankruptcy appellate panel--affords de novo review to the bankruptcy court's conclusions of law."). Under the familiar summary judgment standards, we must "determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Century 21 Balfour Real Estate v. Menna, 16 F.3d 7, 9 (1st Cir. 1994) (quotations and citations omitted). Although we view the evidence in the light most favorable to the nonmovant, "[a]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." Id. (quoting Ralar Distribs., Inc. v. Rubbermaid, Inc., 4 F.3d 62, 67 (1st Cir. 1993)) (alteration in original).

**III.**

The Bankruptcy Code offers debtors, through discharge, "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934). "By seeking discharge, however, [the debtor] place[s] the rectitude of his prior dealings squarely in issue, for as the Court has noted, the Act limits th[e] opportunity [for discharge] to the 'honest but unfortunate debtor.'" Brown v. Felsen, 442 U.S. 127, 128 (1979) (quoting Local Loan Co., 292 U.S. at 244). Nevertheless, the Bankruptcy Code does not condition discharge upon a generalized determination of the moral character of the debtor. Instead, it specifies the types of debts that the Code deems exempt from discharge. See, e.g., 11 U.S.C. § 523(a). Moreover, "[e]xceptions to discharge are narrowly construed . . . and the claimant must show that its claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." Century 21 Balfour Real Estate, 16 F.3d at 9.

**A. The scope of the exception to discharge.**

As the party seeking to prevent Spigel from discharging his debt to them, the McCrorys bear this burden to show that Spigel's debt comes squarely within an exemption from discharge. They focus their argument solely on 11 U.S.C. § 523(a)(2)(A), which exempts from discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--false

pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). Applying this language, we have said that the statutory language does not "remotely suggest that nondischargeability attaches to any claim other than one which arises as a direct result of the debtor's misrepresentations or malice." Century 21 Balfour Real Estate, 16 F.3d at 10.[5] Thus, in order to establish that a debt is nondischargeable because obtained by "false pretenses, a false representation, or actual fraud," we have held that a creditor must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable,[6] and 6) the reliance upon the false statement caused

---

[5]    In Century 21 Balfour Real Estate, the debt was created through a crossclaim for equitable indemnification between the creditor and the debtor, both of whom were named as defendants in an action alleging fraud against the debtor and negligence against the creditor. Id. at 8.  Both defendants were held liable, after which the crossclaim was allowed "because [the creditor's] mere negligence made it less culpable than [the debtor], whose conduct had been found fraudulent." Id.

[6]    As originally formulated in this circuit, a creditor's reliance had to be reasonable. Commerce Bank & Trust Co. v. Burgess, 955 F.2d 134, 140 (1st Cir. 1992); Century 21 Balfour Real Estate, 16 F.3d at 10.  The Supreme Court, however, has since overruled this formulation and, drawing from the Restatement (Second) of Torts, held that a creditor's reliance need only be justifiable. Field v. Mans,

damage.  Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997).

Though the first two elements of the Palmacci test describe the conduct

and scienter required to show fraudulent conduct generally, the last

four embody the requirement that the claim of the creditor arguing

nondischargeability in an adversary proceeding must arise as a direct

result of the debtor's fraud.[7]

Reading the statute to require such a direct link is

supported by the legislative history.  Prior to 1984, some courts had

interpreted § 523(a)(2)(A) as preventing the discharge of an entire

---

516 U.S. 59, 70-71 (1995).

[7]    We note that the Seventh Circuit has recently called into
question whether the Palmacci test should properly be considered the
exclusive test to determine nondischargeability under § 523(a)(2)(A).
In McClellan v. Cantrell, 217 F.3d 890 (7th Cir. 2000), that court
noted that Palmacci and similar cases have adopted a test that focuses
solely upon false representations as the total universe of fraud under
§ 523(a)(2)(A), in large part because false representations were the
only fraud before those courts.  Id. at 892. § 523(a)(2)(A), however,
explicitly lists both "actual fraud" and "false representations" as
grounds for denying a discharge, a distinction in the statutory
language that the McClellan court relied upon to hold that "actual
fraud" encompasses more than misrepresentations.  Id. at 892-93; see
also Mellon Bank N.A. v. Vitanovich, 259 B.R. 873, 876 (B.A.P. 6th Cir.
2001) (adopting McClellan's definition of actual fraud to evaluate
nondischargeability of a debt created by a check kiting scheme).
Though there are differences between McClellan and Palmacci-the most
significant of which concerns whether reliance is required--we do not
decide whether we would adopt the Seventh Circuit's reasoning.
McClellan is consistent with our existing precedent in that it also
requires a direct link between the alleged fraud and the creation of
the debt.  McClellan, 217 F.3d at 894-95 (noting that the actual fraud
denied discharge under § 523(a)(2)(A), as opposed to constructive
fraud, requires a showing that the fraud created the debt); see also,
e.g., Century 21 Balfour Real Estate, 16 F.3d at 10.

-11-

debt even though the fraudulent conduct of the debtor was directly related only to a part of that debt. See, e.g., Birmingham Trust Nat'l Bank v. Case, 755 F.2d 1474, 1477 (11th Cir. 1985) (holding that debtor's misrepresentations regarding ownership of collateral caused entire debt, rather than just the value of the collateral, to be nondischargeable). Congress responded by adding "to the extent obtained by" to § 523(a)(2), Pub. L. 98-353 § 454(a)(1)(B), a change that other courts have interpreted as "expressly limit[ing] the exception to discharge to the extent that [the debt] was actually obtained by the fraudulent conduct." Muleshoe State Bank v. Black, 77 B.R. 91, 92 (N.D. Texas 1987); see also Nova Home Health Servs., Inc. v. Casagrande, 143 B.R. 893, 899 n.6 (Bankr. W.D.Mo. 1992). Thus, in order to prevail in the adversary proceeding, the McCrorys must show that the debt Spigel owes to them "arises as a direct result of the debtor's misrepresentations or malice." Century 21 Balfour Real Estate, 16 F.3d at 10.

**B. The relationship between the debt and the fraudulent conduct.**

In seeking to demonstrate that Spigel's debt is nondischargeable, the McCrorys rely exclusively upon the collateral estoppel effect of the judgment in the Rhode Island Superior Court that created the debt. The ordinary rules of collateral estoppel and res judicata apply in most actions in the bankruptcy court, including adversary proceedings under § 523(a) to except debts from discharge.

-12-

FDIC v. Shearson-American Express, Inc., 996 F.2d 493, 497 (1st Cir. 1993); Grogan v. Garner, 498 U.S. 279, 284 n.11 (1991). But see Brown, 442 U.S. at 138 (casting doubt upon the applicability of res judicata in § 523(a) actions). We look to state law to determine the preclusive effect of a prior state court judgment. New Hampshire Motor Transp. Ass'n v. Town of Plaistow, 67 F.3d 326, 328 (1st Cir. 1995). Under Rhode Island law, for collateral estoppel, or issue preclusion, to apply, there must be "an identity of issues; the prior proceeding must have resulted in a final judgment on the merits; and the party against whom collateral estoppel is sought must be the same as or in privity with the party in the prior proceeding." Commercial Union Ins. Co. v. Pelchat, 727 A.2d 676, 680 (R.I. 1999) (quoting State v. Chase, 588 A.2d 120, 122 (R.I. 1991)); see also Casco Indem. Co. v. O'Conner, 755 A.2d 779, 782 (R.I. 2000). The first of these requirements, the identity of issues in both actions, creates the controversy in this case.

Both the BAP and the McCrorys focus their attention on the question of whether the Superior Court judgment established any fraud. In reversing the bankruptcy court, the BAP concluded that

> the essential elements of an exception to discharge under Section 523(a)(2)(A), false representations, false pretenses, or actual fraud, were not plead, litigated in, or determined by the state court. The McCrorys' state court complaint does not mention fraud, false representations, false pretenses,

-13-

> misrepresentation or deceit as a basis for indemnification. Moreover, neither party, in the summary judgment pleadings and in oral argument before the state court, argued fraud. . . . The judgment of the state court established the debtor's liability under equitable indemnification principles, not fraud.

Consequently, the BAP found that "neither res judicata or collateral estoppel was appropriate in this case."

We have reservations about this analysis and its close attention to the labels describing the legal theories underlying the Superior Court judgment. Indeed, the McCrorys point to the Superior Court's declaration that the transaction between Spigel and Tarbox bore "no indicia of legitimacy" as a demonstration that they proved in the state court that Spigel engaged in fraud. We agree. The Superior Court found that Spigel held himself out during the sale to Tarbox as an agent of Frenchtown and provided a New Jersey title for the car he sold to Tarbox indicating that Frenchtown had been a buyer of the car. Both of these statements were patently false. Spigel himself acknowledged that his authority to act as an agent for Frenchtown extended only to selling cars at auction or off the Frenchtown lot. The Tarbox sale, however, took place on the Tarbox lot. Moreover, it is undisputed that Frenchtown had never owned the cars.

However, this showing in the Superior Court action of fraudulent conduct by Spigel is not identical to the fraud showing required by § 523(a)(2)(A). The finding of the Rhode Island Superior

-14-

Court that Spigel engaged in fraudulent conduct is, at most, identical only to the first two elements of the Palmacci test, i.e., that Spigel made a false statement with an intent to deceive.  That finding does not demonstrate that the McCrorys' claim "arises as a direct result of the debtor's misrepresentations or malice," Century 21 Balfour Real Estate, 16 F.3d at 10, as required by the remaining four elements of Palmacci and the identity of issues element of collateral estoppel.  We explain.

In attempting to recover from Spigel the sum of their liability to Tarbox, the McCrorys proceeded on a theory of equitable indemnification, a theory that allows one "exposed to liability solely as the result of a wrongful act of another . . . to recover from that party."  Muldowney v. Weatherking Prods., Inc., 509 A.2d 441, 443 (R.I. 1986); see also Helgerson v. Mammoth Mart, Inc., 335 A.2d 339, 341 (R.I. 1975) (allowing indemnification "where one person is exposed to liability by the wrongful act of another in which he does not join").  The McCrorys had to prove three elements for the Superior Court to resolve that claim in their favor: 1) that they, as the parties seeking indemnification, are liable to a third party, Tarbox, 2) that the prospective indemnitor, Spigel, is also liable to that third party, and 3) that as between the two, equity demands that the indemnitor discharge the obligation.  Wilson v. Krasnoff, 560 A.2d 335, 341 (R.I. 1989).  The McCrorys satisfied the third element of their equitable

-15-

indemnification claim by proving that Spigel had wronged Tarbox while they were blameless for that loss.  They did not prove, nor were they required to, that Spigel had intended to harm them.  See, e.g., id. ("One situation satisfying this third element is when a potential indemnitor is at fault and the prospective indemnitee is blameless.").

Because the Superior Court was not asked to find, and did not find, any wrongdoing by Spigel directed at the McCrorys in the creation of his indebtedness to them, its judgment simply does not establish that the claim of the McCrorys is "one which arises as a direct result of the debtor's misrepresentations or malice." Century 21 Balfour Real Estate, 16 F.3d at 10.  All of Spigel's actions were directed at Tarbox.  There is no finding by the Superior Court that Spigel intended to induce the McCrorys to rely on his false statements.  Indeed, there was no evidence before that court to support any such findings.  Spigel did not make any statements to the McCrorys at all about the Tarbox transaction, much less false statements that the McCrorys justifiably relied upon, with that reliance causing the debt.

All six of the Palmacci elements, however, and thus the direct link between the fraud and the debt, are arguably present between Spigel and Tarbox. Thus, if the Superior Court judgment for equitable indemnification permitted the McCrorys to succeed to Tarbox's position with respect to the transaction, they might be able to cure the defect we have identified here.  The McCrorys have not shown, as

they must, that they stand in Tarbox's shoes.  It is far from clear that Rhode Island law permits the McCrorys as equitable indemnitees to succeed to Tarbox's position; most likely, it does not.  Silva v. Home Indemnity Co., 416 A.2d 664, 668 (R.I. 1980); Hawkins v. Gadoury, 713 A.2d 799, 803 (R.I. 1998) (noting that though statute of limitations in subrogation action runs from the date of the original injury, equitable indemnification causes of action accrue upon the discharge from common liability).  Consequently, we conclude that the collateral estoppel effect of the Superior Court judgment was an insufficient basis for demonstrating that Spigel's debt was nondischargeable under § 523(a)(2)(A).

**IV**.

We understand that exceptions to discharge serve both to punish the debtor and "concomitantly to protect the inculpable creditor."  Century 21 Balfour Real Estate, 16 F.3d at 10.  The McCrorys are inculpable creditors who are not protected by the outcome here.  However, that protective policy must be balanced against the policy that exceptions to discharge are construed narrowly.  Moreover, the result here is not solely attributable to the strictures of the Bankruptcy Code.  In pursuing their claim under § 523(a)(2)(A), the McCrorys relied entirely upon the collateral estoppel effect of the Superior Court judgment instead of supplementing that judgment with evidence that might have addressed the remaining four elements of

-17-

<u>Palmacci</u>.  Thus, they failed to meet their burden under § 523(a)(2)(A),

and Spigel's debt to them must be discharged.

**<u>Affirmed.</u>**