IN RE Eric ZUTRAU, Debtor.

Leilani Zutrau, Plaintiff–Appellee,

v.

Eric Zutrau, Defendant–Appellant.

BAP NO. MB 16–029
Bankruptcy Case No. 11–11815–FJB
Adversary Proceeding No.
11–01183–FJB

United States Bankruptcy Appellate Panel
of the First Circuit.

February 16, 2017

Eric Zutrau, Pro Se, on brief for Defendant–Appellant.

Dmitry Lev, Esq., for Plaintiff–Appellee.

Before Deasy, Tester, and Finkle,
United States Bankruptcy Appellate Panel
Judges.

Tester, U.S. Bankruptcy Appellate
Panel Judge.

Eric Zutrau (the "Debtor") appeals pro se [1] from the bankruptcy court's amended judgment determining that certain debts he owed to his sister, Leilani Zutrau (the "Appellee"), were nondischargeable pursuant to § 523(a)(2)(A) and (a)(6).[2] For the reasons set forth below, we **AFFIRM**.

## BACKGROUND

### I. Adversary Proceeding

Three months after the Debtor filed his chapter 7 petition, the Appellee filed a timely complaint seeking a determination that his debts to her in the total amount of $427,522.90 were nondischargeable under § 523(a)(2)(A) as debts arising from false representations, and under § 523(a)(6) as debts for willful and malicious injury. After the Debtor answered the complaint, the Appellee filed an amended. complaint to allege additional facts to support her § 523(a)(2)(A) and (a)(6) counts and to object to the Debtor's discharge under § 727(a)(2)–(4).

On August 16, 2011, despite the existence of the amended complaint which included a count objecting to the Debtor's discharge, the bankruptcy court entered an order discharging the Debtor.[3]

Thereafter, the bankruptcy court held a hearing on the Debtor's motion to dismiss the complaint, the Appellee's motion for leave to amend further the complaint (to add additional facts to support her objections to discharge under § 727(a)(2)–(4)), and the Debtor's opposition to the motion for leave to amend (in which he argued that the proposed amendment was futile as the court had already entered his discharge). Subsequently, the court dismissed

---

**1.** The Debtor was represented by counsel throughout the proceedings in the bankruptcy court.

**2.** Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq. All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure. All references to "Rule" shall be to the Federal Rules of Civil Procedure.

**3.** In a later order on the Appellee's motion for leave to file another amended complaint, the bankruptcy court explained why it entered the discharge, stating: "No objection to discharge having been filed by the deadline for doing so, the Court entered a discharge in favor of [the Debtor] on August 16, 2011." See A.P. Doc. No. 47 at 2.

the Appellee's objections to discharge under § 727(a)(2)–(4), but allowed the Appellee to assert a revocation of discharge count under § 727(d). The court also denied the Debtor's request to dismiss the § 523(a)(2)(A) and (a)(6) counts.

In January 2014, the Debtor filed a motion for summary judgment as to the remaining counts under § 523(a)(2)(A), § 523(a)(6), and § 727(d), all of which the Appellee opposed. After a hearing, the bankruptcy court granted summary judgment in favor of the Debtor as to the count under § 727(d) for revocation of discharge and denied summary judgment as to the nondischargeability counts under § 523(a)(2)(A) and (a)(6). Although the Appellee moved for reconsideration and sought leave to file a third amended complaint, the bankruptcy court denied the motions after holding a hearing. As a result, only the nondischargeability counts under § 523(a)(2)(A) and (a)(6) remained for adjudication in the adversary proceeding.

In September 2014, the bankruptcy court held a five-day trial, at which both the Appellee and the Debtor testified. After the trial, the parties submitted proposed findings of facts and conclusions of law. On March 16, 2015, the bankruptcy court heard the parties' closing arguments, and took the matter under advisement.

## II. The Bankruptcy Court's Decision

On February 24, 2016, the bankruptcy court entered a judgment ("Judgment") in favor of the Appellee ruling that $193,000 of the debt the Debtor owed the Appellee, plus applicable interest thereon, was excepted from discharge, and the balance of the debt was dischargeable. In its accompanying memorandum of decision, the

bankruptcy court specified that $193,000, plus all applicable interest, was excepted from discharge under § 523(a)(2)(A), and of that amount, $80,000, plus all applicable interest, was also excepted from discharge under § 523(a)(6). See Zutrau v. Zutrau (In re Zutrau), 546 B.R. 239, 241 (Bankr. D. Mass. 2016).[4] In its decision, the bankruptcy court made thorough and detailed factual findings and legal conclusions based on the record, and the testimonial and documentary evidence presented at the trial.

### A. Bankruptcy Court's Findings of Fact

The Debtor was a self-employed contractor. The Appellee was employed as an executive at a financial services firm until June 2007; thereafter, she was self-employed performing "accounting work."

#### 1. The Properties

#### (a) The Oak Bluffs Property

In 2002, the Debtor and the Appellee agreed to combine their resources and abilities to build a single family house on land the Debtor owned in Oak Bluffs, Massachusetts (the "Oak Bluffs Property"). The Debtor subsequently conveyed 50% of his interest in the Oak Bluffs Property to the Appellee, and they became tenants in common. In exchange for this conveyance, the Appellee agreed to contribute funds toward the construction project. The parties agreed that after the Appellee had contributed sufficient funds as consideration for her 50% interest, they would evenly split the expenses of the construction project. The parties obtained a $200,000 construction loan, and building began with the Debtor supervising the

---

[4]. As the Debtor does not dispute most of the bankruptcy court findings, much of what follows is a review of those findings.

construction of the house. The house was completed in 2010.

### (b) The Brookline Property

In 2006, the Debtor identified a property in Brookline, Massachusetts (the "Brookline Property") that he believed would be a profitable condominium conversion venture, and he approached the Appellee for funding. In March 2006, the Appellee loaned the Debtor $123,000 for him to use as a down payment to purchase the Brookline Property. The Appellee borrowed the funds from her line of credit with Chase Bank which was secured by her personal residence in New York ("Chase LOC").

On March 24, 2006, the Debtor executed a promissory note in which he agreed to repay the Appellee $123,000, with interest at a yearly rate of 7%, on or before September 24, 2006. The note contained a security clause providing that the principal and interest owed under the note would be secured by the Debtor's interest in the Oak Bluffs Property.

Using the $123,000 from the Appellee as a down payment, the Debtor purchased the Brookline Property in April 2006 for $825,000. The Debtor financed the balance of the purchase price by borrowing $618,750 from Taylor, Bean & Whitaker Mortgage Corp. and $122,901 from National City Bank, secured by first and second mortgages, respectively, on the Brookline Property.

### 2. The Citibank Line of Credit

In late March 2006, with the Debtor's consent, the Appellee obtained a $400,000 line of credit from Citibank ("Citibank LOC") secured by the Oak Bluffs Property. The Appellee was the sole obligor on the underlying promissory note. The parties had initially intended to apply for this line of credit together, but the Debtor's poor credit score dissuaded them from

adding the Debtor's name to the application.

In April 2006, with the Debtor's consent, the Appellee used $123,000 drawn from the Citibank LOC to satisfy in full the Chase LOC, in effect, transferring the Chase LOC to the Citibank LOC. Thereafter, the Appellee drew additional funds from the Citibank LOC to fund the still ongoing Oak Bluffs Property construction and to pay for a portion of the Debtor's personal expenses. The parties agreed to share equally the cost of the interest payments on the Citibank LOC.

### 3. Note A

By September 2006, the Appellee had contributed sufficient funds toward the Oak Bluffs Property to more than satisfy her 50% interest in the property. At this time, the Debtor acknowledged that in addition to owing the Appellee the $123,000 he borrowed to purchase the Brookline Property, he owed the Appellee $77,000 for his share of the expenses for the Oak Bluffs Property.

In September 2006, rather than repaying the $123,000, plus interest, due under the promissory note as he had agreed, the Debtor asked the Appellee to loan him an additional $100,000 to continue the conversion of the Brookline Property into condominiums. He also asked the Appellee to "cover" his portion of the interest payments owed on the Citibank LOC for the duration of the loan. The Debtor promised to repay the full amount he owed the Appellee, from the sale proceeds of the Brookline Property condominiums, immediately after he satisfied the bank mortgages. In an e-mail dated September 11, 2006, the Debtor stated, "When I s[ell] the [Brookline Property], which I aim to do this fall, you will be right behind the bank, before anyone private I owe." In another e-mail dated September 16, 2006, the Debtor stated he intended to "repay . . .

upon sale [of the Brookline Property] . . . even if I don't get to condo it." The two e-mails are referred to collectively as the "September 2006 E-mails."

On September 22, 2006, the Appellee loaned the Debtor the additional $100,000 using funds she borrowed from the Citibank LOC. The Appellee also agreed to temporarily "cover" $13,000 of the Debtor's portion of the upcoming interest payments on the Citibank LOC. The bankruptcy court found that, when making this loan, the Appellee relied on the Debtor's representation that after he satisfied his bank debts he would pay her in full using the sale proceeds of the Brookline Property condominiums.

On September 22, 2006, the Debtor executed a promissory note ("Note A") in which he agreed to repay the Appellee a total of $241,000 on or before April 22, 2007. The amount was comprised of the original $123,000 loan for the purchase of the Brookline Property; the new $100,000 loan; $13,000 for the Debtor's share of interest payments on the Citibank LOC; and $5,000 the Debtor owed the Appellee from a separate transaction. Note A contained a security clause which provided that "until the principal and interest owed under this promissory note are paid in full, this note will be secured by the mortgage covering [the Oak Bluffs Property]." Note A did not contain a separate provision for the payment of interest, but it did contemplate the accrual of interest, providing that the Debtor would make a lump-sum payment for the entire balance of "accrued principal & interest," and that payments would be applied "first to interest and then to principal." Note A also contained a "Collection of Costs" provision which provided: "If [the Appellee] prevails in a lawsuit to collect on this note, [the Debtor] will pay [the Appellee]'s costs and lawyer's fees in an amount the court finds to be reasonable."

On September 22, 2006, pursuant to the terms of Note A, the Debtor recorded a mortgage he had executed in favor of the Appellee on the Oak Bluffs Property in the amount of $241,000.

#### 4. Note B

In December 2006, the Debtor approached the Appellee about borrowing an additional $30,000 to continue developing the Brookline Property. On December 18, 2006, the Debtor executed a promissory note ("Note B") in which he agreed to repay the Appellee $30,000, plus interest at a yearly rate of 7.75%, on or before February 18, 2007. Note B contained a security clause which provided that "until the principal and interest owed under this promissory note are paid in full, this note will be secured by a mortgage covering the [Brookline Property]." The Debtor orally promised the Appellee that he would execute and record a separate mortgage on the Brookline Property to secure the debt embodied by Note B. The bankruptcy court found that the Appellee, who lived in New York and traveled extensively, trusted the Debtor, who lived in Massachusetts, to both execute and record the mortgage securing Note B.

The Appellee loaned the Debtor the $30,000 identified in Note B in December 2006. The bankruptcy court found that, in making this loan, the Appellee relied on the Debtor's representation that he intended to execute and record a mortgage securing this debt, and the representations contained within Note B. Additionally, the bankruptcy court found that the Appellee continued to rely on the Debtor's promise in his September 2006 E-mails that he would pay the Appellee in full from the sale proceeds of the Brookline Property condominiums after he had paid off his existing bank debts.

The Debtor did not execute or record a mortgage on the Brookline Property securing Note B.

### 5. Note C

In January 2007, the Debtor asked the Appellee to loan him an additional $30,000 for the development of the Brookline Property. On January 9, 2007, the Debtor executed a promissory note ("Note C") in which he promised to repay the Appellee $30,000, plus interest at a yearly rate of 7.75%, on or before February 18, 2007. Note C contained a security clause (identical to that of Note B) stating that Note C would be secured by a mortgage covering the Brookline Property, and a Collection of Costs provision (identical to that of Note A) providing for attorney's fees and costs. Pursuant to Note C, the Debtor executed a mortgage on the Brookline Property to secure the debt embodied by Note C. The Debtor orally promised but failed to record this mortgage.

The Appellee loaned the Debtor the $30,000 identified in Note C in January 2007. The bankruptcy court found that, in making this loan, the Appellee not only relied on the Debtor's representation that he intended to record the mortgage, but also the representations contained within Note C. Additionally, the bankruptcy court found the Appellee continued to rely on the Debtor's promise in the September 2006 E-mails that he would pay her in full from the sale proceeds of Brookline Property condominiums after he paid off his existing bank debts.

### 6. Refinancing of Second Mortgage on the Brookline Property

On February 14, 2007, the Debtor refinanced the National City Bank second mortgage and executed and recorded new mortgage in favor of National City Bank in the amount of $250,000. The Debtor did not tell the Appellee about the new mortgage.

### 7. Repayment of Note B

In February and March 2007, the Debtor repaid the Appellee a total of $30,000 which represented the principal he owed on Note B (the "$30,000 Repayment").

### 8. Note D

In April 2007, the Debtor again approached the Appellee for an additional $30,000 to finance the Brookline Property project. At this time, Note C was overdue. The Debtor, however, assured the Appellee "that he would protect [her] interests and that he was actively trying to finish the project and sell the [Brookline Property] as soon as he could and that it was going to happen quickly and, therefore, [the Appellee] shouldn't worry, that he would repay [her] everything." The bankruptcy court found the Appellee took assurance in the fact that the Debtor had paid off Note B, and in her belief that the Debtor had done as he had promised and recorded a mortgage on the Oak Bluffs Property with respect to Note A and recorded a mortgage on the Brookline Property with respect to Notes B and C. In reality, however, the Debtor had only recorded the Oak Bluffs Property mortgage securing Note A.

On April 23, 2007, the Debtor executed a promissory note ("Note D") in which he promised to repay $30,000, plus interest at a yearly rate of 7.75%, on or before June 14, 2007. Note D contained a security clause (identical to the security clauses in Notes B and C) stating that Note D would be secured by a mortgage on the Brookline Property. The Debtor orally promised the Appellee that he would execute and record a mortgage on the Brookline Property to secure the debt embodied by Note D. Note D also contained a Collection of Costs provision (identical to that of the prior notes) providing for attorney's fees and costs.

In April 2007, the Appellee loaned the Debtor the $30,000 identified in Note D from her personal funds. The bankruptcy court found that, in making this loan, the Appellee relied on the Debtor's representation that he intended to execute and record a mortgage securing this debt, and the representations contained within Note D. Additionally, the bankruptcy court found the Appellee continued to rely on the Debtor's promise in the September 2006 E-mails that he would pay her in full from the sale proceeds of the Brookline Property condominiums after he paid off his existing bank debts.

The Debtor did not execute or record a mortgage on the Brookline Property securing Note D.

### 9. Note E

In June 2007, the Debtor approached the Appellee yet again for an additional $20,000 to finish the Brookline Property project. On June 15, 2007, the Debtor executed a promissory note ("Note E") in which he promised to repay the Appellee $20,000 plus interest at a yearly rate of 7.75%. Note E contained the same security clause as the prior notes stating that the debt embodied by Note E would be secured by a mortgage on the Brookline Property, and the same Collection of Costs provision as the prior notes providing for attorney's fees and costs. Once again, the Debtor promised to execute and record a mortgage on the Brookline Property to secure Note E.

The Appellee loaned the Debtor the $20,000 identified in Note E in June 2007. The bankruptcy court found that, in making this loan, the Appellee once again relied on the Debtor's representation that he intended to execute and record a mortgage securing this debt and the representations contained within Note E. The court also found the Appellee continued to rely on the Debtor's promise in the September

2006 E-mails that he would pay the Appellee in full from the sale proceeds of the Brookline Property condominiums after he paid off his existing bank debts.

The Debtor did not execute or record a mortgage on the Brookline Property securing Note E.

### 10. Oak Bluffs Property Expenses

On June 16, 2007, the Debtor acknowledged that the amount he owed the Appellee for his share of the Oak Bluffs Property expenses was approximately $83,000.

### 11. Additional Loans Between July and November 2007

In June 2007, the Appellee lost her job. Around this time, the Debtor approached the Appellee for additional funds. The Appellee was reluctant to give the Debtor any more money and she reiterated she wanted to be repaid. The Debtor responded that if the Appellee "didn't keep loaning him money to finish the project that [her] repayment was at risk." The Debtor insisted that he needed more money to finish the project so that he could sell the Brookline Property and pay the Appellee back.

From July through November 2007, the Appellee loaned the Debtor additional funds in over twenty separate installments totaling $150,296 (the "$150,296 Loan"), using money she borrowed from the Chase LOC. The Appellee considered these installments to be an "extraordinary loan," as they required her to borrow against her home. At this point, however, she felt that her only chance of being repaid was to continue helping the Debtor finish the Brookline Property. The Appellee claimed that, as an incentive for extending these additional funds, the Debtor promised to pay her an extra $15,000 (the "15,000 Bonus Payment") when he sold the Brookline Property condominiums. The bankruptcy court found the Debtor did make this

promise and he does not challenge that finding on appeal.

In October 2007, as the Appellee grew increasingly frustrated with the situation, she asked the Debtor if he had recorded mortgages securing Notes B through E as he had promised. The Debtor admitted that he had not recorded the mortgages. After this revelation, the Appellee insisted, by an e-mail dated October 28, 2007 (the "October 2007 E-mail"), that the Debtor record mortgages securing all of the unsecured debt the Debtor owed her. She acknowledged, however, that they might have to wait until after the Debtor completed a refinancing of the Brookline Property that he was currently contemplating.

### 12. Refinancing and Sale of the Brookline Property Condominiums

On November 26, 2007, the Debtor again refinanced the Brookline Property, obtaining a loan of $333,000 and granting a mortgage in the same amount to Mortgage Electronic Registration Systems, Inc., as nominee for Union Capital Business Trust ("MERS"). The Debtor did not inform the Appellee of this mortgage. On November 30, 2007, the Debtor sold the first of three condominium units at the Brookline Property for $550,000. He did not inform the Appellee of the sale. In December 2007, using the proceeds of the new loan and sale, the Debtor obtained discharges of the

$618,750 first mortgage and the $250,000 second mortgage.

On April 30, 2008, the Debtor sold the second condominium unit for $369,000, and, on June 16, 2008, the Debtor sold the third and last condominium unit for $365,000. The Debtor applied approximately $333,000 of the sale proceeds to pay off MERS. A discharge of this mortgage was recorded on August 25, 2008.

### 13. The $250,000 Repayment

On or about May 5, 2008, the Debtor repaid the Appellee $250,000 (the "$250,000 Repayment"). The Appellee applied the $250,000 Repayment as follows: (1) $150,296 to satisfy the $150,296 Loan; (2) $15,000 to satisfy the $15,000 Bonus Payment; and (3) $84,704 to satisfy the Debtor's share of the Oak Bluffs Property expenses.

Although the Debtor did not dispute Appellee's application of funds to satisfy the $150,296 Loan, he did challenge her application of funds to satisfy the $15,000 Bonus Payment and the $84,704 he owed for his share of the Oak Bluffs property expenses. The bankruptcy court found, however, that the parties agreed that the Appellee would satisfy what the Debtor owed her for his share of Oak Bluffs Property expenses from the $250,000 Repayment.[5] The Debtor challenges this finding on appeal.

5. The bankruptcy court stated as follows:

[The Appellee] applied $84,704 of the $250,000 to [the Debtor's] share of the Oak Bluffs Property expenses. [The Appellee] testified that the parties agreed to apply the $84,704 toward the Oak Bluffs Property expenses. [The Debtor] testified to the contrary. I do not find [the Debtor] credible on this point as his own e-mails indicate his desire to use these funds to pay down the secured debt linked to the Oak Bluffs Property. In an e-mail dated April 1, 2008, shortly before making the $250,000 pay-

ment, Eric told [the Appellee], "My debt to you will be paid in full, pretty soon, starting with the May [$250,000] payment, that should put me in positive equity in [the Oak Bluffs Property] and then we should discuss the solution that will get you paid off in the best way." I credit [the Appellee's] testimony on this point. Accordingly, I find that the parties agreed that $84,704 of the $250,000 would be applied to [the Debtor's] share of the Oak Bluffs Property expenses.

In re Zutrau, 546 B.R. at 249–50 (footnote omitted).

After the Appellee's application of the $250,000 Repayment, the Debtor continued to owe the Appellee at least $321,000 plus all applicable interest, as follows: (1) $241,000 for the principal of Note A; (2) $30,000 for the principal of Note C; (3) $30,000 for the principal of Note D; (4) $20,000 for the principal of Note E; and (5) all applicable interest under the terms of those notes. Although the Debtor had approximately $151,000 remaining from the sale proceeds of the Brookline Property, he did not submit any of that money to the Appellee to pay down his remaining debts to her, instead using the money to pay off other unsecured creditors.

### 14. State Court Litigation

In the summer of 2008, the Appellee informed the Debtor that she wanted to be repaid in full. The already strained relationship broke down completely, and the parties eventually proceeded to litigation in Massachusetts state court in 2009. During discovery, the Appellee learned for the first time about the multiple refinancings of the Brookline Property. The state court litigation was eventually stayed by the Debtor's bankruptcy filing.

### B. Bankruptcy Court's Analysis
#### 1. The § 523(a)(2)(A) Count

As to the § 523(a)(2)(A) count, the court found the Debtor knowingly made a false representation in September 2006 when he promised to pay the Appellee back in full from the sale of the Brookline Property, after repaying the banks, and he "intended to deceive [the Appellee] when he made this fraudulent representation in order to induce her to loan him more money." In re Zutrau, 546 B.R. at 252. The court also found the totality of the circumstances demonstrated the Debtor never intended to honor his promise, as evidenced by his subsequent actions in twice refinancing the Brookline Property without the Appellee's

knowledge, his failure to record mortgages to protect the Appellee's position, and his failure to repay her in full from the sale proceeds of the Brookline Property condominiums. Id. at 252–53. With respect to Note A, the court found the Appellee justifiably relied on the Debtor's promise when lending him an additional $100,000 and agreeing to cover $13,000 of his share of payments. Id. at 253. The court found, however, there was no reliance with respect to the $123,000 down payment which was incorporated into Note A as the Appellee lent those funds prior to the Debtor's promise, or with respect to the $5,000 she loaned him in a "separate transaction" as the Appellee presented no evidence as to the circumstances of that loan. Id. With respect to Notes B through E, the court found the Appellee justifiably relied on the Debtor's false representation when she lent the Debtor those funds. Id. The court also found the Appellee incurred damages as a result of her reliance on the Debtor's false representation, and rejected the Debtor's arguments that the Appellee incorrectly applied the $250,000 Repayment and that he had repaid Notes C, D, and E. Id. at 253–54.

The bankruptcy court also found the Debtor made knowingly false representations when he promised to execute and record mortgages on the Brookline Property securing Notes B, C, D, and E (but not as to Note A as the Debtor executed and recorded a mortgage for Note A). In re Zutrau, 546 B.R. at 254. The court found the Debtor intended to deceive the Appellee in order to induce her to loan him funds, and the totality of the circumstances demonstrated his fraudulent intent. Id. The court found the Appellee actually and justifiable relied on these false representations, and she incurred damages as a result. Id. at 254–55.

Based on the foregoing, the bankruptcy court ruled that $193,000 was excepted from discharge pursuant to § 523(a)(2)(A), representing:

> $113,000 of the principal under Note A ($100,000 new loan, plus $13,000 for the Debtor's share of interest on the Citibank LOC);
>
> $30,000 of the principal of Note C;
>
> $30,000 of the principal of Note D;
>
> $20,000 of the principal of Note E; and
>
> All applicable interest under the terms of the respective notes.

Id. at 255.

This total did not include $128,000 of the $241,000 principal of Note A (for the Debtor's prior debts of $123,000 and $5,000, which were incorporated into the note). Id. Nor did it include the amounts owed under Note B, or the funds the Appellee loaned to the Debtor between July and November 2007, as the Debtor had repaid those amounts. Id. The total also did not include the alleged balance for the Debtor's share of the Oak Bluffs Property expenses, other than the $13,000 included in Note A, as the Appellee did not provide sufficient evidence that she incurred the expenses in reliance on the Debtor's false representation. Id.

### 2. The § 523(a)(6) Count

As to the § 523(a)(6) count, the bankruptcy court found that Notes B through E contained security clauses which provided that the debts would be secured by mortgages on the Brookline Property. Id. at 256. The bankruptcy court found, notwithstanding the Debtor's failure to execute and record mortgages for Notes B, D, and E, these security pledges created a property interest (i.e. unperfected mortgage) for the Appellee "in the Brookline Property securing the amounts owed under Notes B through E, albeit one that was junior in priority to recorded mortgag-

es . . . ." Id. Therefore, the bankruptcy court found the Appellee "held an interest in any proceeds from the sale of the Brookline Property condominium units." Id. Because the Debtor did not pay off Notes C, D, and E, the Appellee held an interest in the $151,000 sale proceeds (remaining after paying off senior encumbrances). Id.

The court found that when the Debtor "used the sale proceeds in which [the Appellee] held an interest to pay off unsecured debts to other lenders," he caused injury to the Appellee. Id. It found the Debtor "caused this injury deliberately as he intentionally diverted these funds for his own benefit with full knowledge of his obligation to turn them over to his sister." Id. Thus, the Debtor "was well aware of both the injury he was causing and the wrongfulness of his actions." Id. As a result, the court found the Appellee established all the elements of § 523(a)(6) with respect to $80,000 of the debt, plus all applicable interest thereon. Id. at 256–57.

Thus, the bankruptcy court held that, of the $193,000 excepted from discharge under § 523(a)(2)(A), $80,000, plus all applicable interest thereon, was excepted from discharge on a separate basis under § 523(a)(6) due to the Appellee's unperfected interest in the sale proceeds for the Brookline Property securing the amounts due under Notes C, D, and E (but not Note A, as the Debtor executed a mortgage with respect to Note A, or Note B, as he repaid that note). Id. at 256–57.

### III. Motion to Amend

On March 9, 2016, the Appellee filed a motion to alter or amend the Judgment pursuant to Rule 59(e) ("Motion to Amend"), to except additional portions of the debt from discharge as follows: (1) $128,000 of the principal of Note A which the bankruptcy court deemed was not ex-

cepted from discharge because it was not originally loaned in reliance on the Debtor's false promise; (2) any interest owed under the terms of Note A; and (3) her legal fees and costs. The Debtor opposed the motion.

After a hearing on May 12, 2016, the bankruptcy court entered an order and memorandum granting the Motion to Amend. The bankruptcy court found the Appellee relied on the Debtor's representation that he would pay her back in full from the sale proceeds of the Brookline Property condominiums after paying off his bank debts when she agreed to incorporate earlier debts totaling $128,000 into Note A, and the incorporation of such earlier debts into Note A constituted a refinancing or a renewal of credit made in reliance on the Debtor's promise. Based on these additional findings, the bankruptcy court held that the Appellee had satisfied all elements of § 523(a)(2)(A) with respect to the remaining $128,000 of the $241,000 principal of Note A. The bankruptcy court also found that all interest, legal fees, and costs to which the Appellee was entitled under the notes were excepted from discharge.

As a result, the bankruptcy court entered an amended judgment ("Amended Judgment") ruling that the debt owed to the Appellee in the amount of $321,000, plus all applicable interest thereon, and all applicable legal fees and costs provided under the terms of the notes, were excepted from the Debtor's discharge. This total consisted of:

$241,000 of the principal of Note A;

$30,000 of the principal of Note C;

$30,000 of the principal of Note D; and

$20,000 of the principal of Note E.

**6.** The Appellee did not cross-appeal the bankruptcy court's dismissal of the § 727(a)

The balance of any debt the Debtor owed the Appellee was not excepted from discharge.

### IV. Notice of Appeal

Thereafter, the Debtor's counsel filed a motion seeking to withdraw as his counsel and to extend the time to file a notice of appeal. The bankruptcy court granted the motion, and on June 6, 2016, the Debtor filed a notice of appeal with respect to the Judgment and the Amended Judgment.[6]

### JURISDICTION

■ We have jurisdiction to hear appeals from final judgments, orders, and decrees of the bankruptcy court. See 28 U.S.C. § 158(a)(1). A bankruptcy court's determination regarding the dischargeability of a debtor's obligations is a final, reviewable order once the damage amount is determined. See Falcone v. Ragonese (In re Ragonese), 505 B.R. 605, 612 (1st Cir. BAP 2014) (citing Douglas v. Kosinski (In re Kosinski), 424 B.R. 599, 606–607 (1st Cir. BAP 2010); Cambio v. Mattera (In re Cambio), 353 B.R. 30, 31 n.1 (1st Cir. BAP 2004). Thus, we have jurisdiction to hear this appeal.

### STANDARD OF REVIEW

■ We review a bankruptcy court's findings of fact for clear error and its conclusions of law de novo. See Castellanos Grp. Law Firm, L.L.C. v. F.D.I.C. (In re MJS Las Croabas Props., Inc.), 545 B.R. 401, 417 (1st Cir. BAP 2016) (citation omitted). Determinations regarding elements of an action under § 523(a)(2) are findings of fact reviewed for clear error. In re Kosinski, 424 B.R. at 607 (citations omitted). "[T]o find clear error, a finding must hit us as more than probably wrong—it must prompt 'a strong, unyield-

counts or the judgment it entered in the Debtor's favor on the § 727(d) count.

ing belief, based on the whole of the record,' that the judge made a mistake." Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41, 45 (1st Cir. 2013) (citation omitted) (internal quotations omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). "The case for deferring to the bankruptcy judge's factfinding is 'particularly strong' when intent is at issue—since an intent finding depends heavily on the debtor's credibility, and the bankruptcy judge is uniquely qualified to make that call." In re O'Donnell, 728 F.3d at 45.

## DISCUSSION

### I. Nondischargeability Under § 523(a)(2)(A)

Section 523(a)(2)(A) provides:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or. an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

11 U.S.C. § 523(a)(2)(A).

■ Because exceptions to discharge are narrowly construed in favor of the debtor in an effort to further the " 'fresh start' " policy underlying the Bankruptcy Code, the creditor asserting an exception to discharge must show that its claim comes " 'squarely' " within an exception enumerated in § 523(a). Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 68 (1st Cir. 2012) (quoting McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001)).

■ In order to establish that a debt is nondischargeable under § 523(a)(2)(A) due to a false representation, a creditor must establish each of the following elements by a preponderance of the evidence:

1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the false statement, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

Id. at 66 (quoting In re Spigel, 260 F.3d at 32).

If the creditor fails to establish any one of the six elements, then the court must reject its claim. Knappik v. Dewhurst (In re Dewhurst), 528 B.R. 211, 224 (Bankr. D. Mass. 2015) (citing Palmacci, 121 F.3d at 787–88). at 615.

■ The first element, making a knowingly false representation, refers to the conduct of the debtor and can include a debtor's promise to act, if, at the time the debtor made the promise, he had no intention of performing. Sega Auto Sales, Inc. v. Flores (In re Flores), 535 B.R. 468, 482 (Bankr. D. Mass. 2015) (citing Palmacci, 121 F.3d at 786). As the First Circuit has stated:

A representation of the maker's own intention to do ... a particular thing is fraudulent if he does not have that intention at the time he makes the representation. ... [A] promise made without the intent to perform it is held to be a sufficient basis for an action of deceit. On the other hand, if, at the time he makes a promise, the maker honestly intends to keep it but later changes his

mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation. This is true even if there is no excuse for the subsequent breach. A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions.

The test may be stated as follows. If, at the time he made his promise, the debtor did not *intend to perform*, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

Palmacci, 121 F.3d at 786–87 (footnotes omitted) (citations omitted) (internal quotations omitted).

 The second element refers to a debtor's mental state and requires "a different type of intent—the debtor's intent to deceive, manipulate, or defraud." In re Flores, 535 B.R. at 482 (citation omitted). "Although the inquiries are distinct, in many cases the same factors show both the debtor's knowledge or recklessness as to the falsity of his representation and his intent to deceive." Id. (citation omitted). "Intent to deceive may be demonstrated by showing that [the debtor made] a false representation 'recklessly, careless of whether it is true or false.'" R.C. Olsen Cadillac, Inc. v. Haras (In re Haras), 526 B.R. 435, 440 (Bankr. D. Mass. 2015) (quoting Palmacci, 121 F.3d at 787). As a debtor will rarely, if ever, admit to acting with an intent to deceive, "the court may infer fraudulent intent from the totality of the circumstances." Id. (citation omitted);

see also Palmacci, 121 F.3d at 789. In addition, "[s]ubsequent conduct may reflect back to the promisor's state of mind and thus may be considered in ascertaining whether there was fraudulent intent at the time the promise was made[.]" Aoki v. Atto Corp. (In re Aoki), 323 B.R. 803, 815 (1st Cir. BAP 2005) (quoting Williamson v. Busconi, 87 F.3d 602, 603 (1st Cir. 1996)).

 The last four elements embody the requirement that the creditor's claim must arise directly from the debtor's fraud. In re Spigel, 260 F.3d at 32 (footnote omitted). As to the creditor's reliance, the U.S. Supreme Court has held that § 523(a)(2)(A) requires only justifiable reliance—a lower standard than reasonable reliance. Field v. Mans, 516 U.S. 59, 74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Reliance is justifiable if the falsity of the representation would not have been readily apparent to the person to whom it was made. Id. at 70–72, 116 S.Ct. 437. For purposes of determining whether reliance was justified, "the circumstances of the reliance claim must be taken into account," and "the individual is not obliged to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood)." Lentz v. Spadoni (In re Spadoni), 316 F.3d 56, 59 (1st Cir. 2003) (citation omitted).

## II. Analysis

 The bankruptcy court identified each of the elements for nondischargeability under § 523(a)(2)(A) and found they were satisfied with respect to debt owed to the Appellee in the amount of $321,000, which consisted of $241,000 of the principal of Note A; $30,000 of the principal of Note C; $30,000 of the principal of Note D; and $20,000 of the principal of Note E. We conclude that the bankruptcy court's findings and conclusions are amply supported

by the record, and, therefore, are not clearly erroneous.

It is undisputed that the Debtor sent the September 2006 E-mails, wherein he stated that after he repaid his bank debts he would pay the Appellee back in full from the sale proceeds of the Brookline Property condominiums. The bankruptcy court found that the Debtor's representation was a specific promise to give the Appellee priority treatment (after the banks), which the Debtor never intended to honor, and that he intended to deceive her when making this promise in order to induce her to loan him more money. The totality of the evidence supports these findings. Subsequent to his promise, the Debtor incurred additional debt from other lenders and granted mortgages on the Brookline Property without the Appellee's knowledge, thereby undermining her personal recovery. The evidence also showed that the Debtor made numerous other false representations in the course of his dealings with the Appellee that demonstrated his willingness to "throw his word around" without any intent of honoring it as he "extracted more and more money from his sister." In addition, when presented with an opportunity to substantially repay his sister with the sale proceeds from the Brookline Property condominiums, he instead opted to pay her only a portion of his obligation and used the excess proceeds to satisfy other debts. Although the Debtor's breach of his promise, by itself, would be insufficient to infer fraudulent intent, his breach combined with his other actions to undermine the Appellee's recovery from the Brookline Property, demonstrated a pattern of deception. Thus, the record supports the bankruptcy court's determination that the Debtor made a knowingly false representation with the intent to deceive the Appellee, and he intended to induce her to rely on the false promise and loan him more money.

The evidence also supports the bankruptcy court's findings that the Appellee justifiably relied on his false representation when loaning the Debtor additional monies evidenced by Notes A through E and when she agreed to a refinancing or renewal of credit with respect to prior debts that were incorporated into Note A. The Appellee credibly testified that she would not have loaned the Debtor additional sums of money if he had not promised to give her priority treatment after he paid off the banks. Moreover, as the court pointed out, the Brookline Property eventually sold for a substantial profit and had the Debtor followed through on his promise to repay the Appellee in full after the banks, she would have recovered much of what she loaned the Debtor. In addition, the evidence showed that the Appellee did not know that the Debtor had twice refinanced the Brookline Property, thus incurring more secured debt and undermining the Appellee's recovery. Thus, the bankruptcy court did not err in finding that the Appellee justifiably relied on the Debtor's false representation. Finally, the evidence supports the bankruptcy court's finding that the Appellee incurred damages as a result of her reliance on the Debtor's false representation in the amount of the outstanding debts.

It was also undisputed that the Debtor executed Notes B through E, in which he promised to execute and record mortgages on the Brookline Property securing the notes, and that the Debtor did not record any mortgages securing Notes B through E. The bankruptcy court found that the Debtor knowingly made false representations when he promised to record the mortgages, and that he intended to deceive the Appellee in order to induce her to loan him more funds. These findings are supported by the record. Although the Debtor

argued that he genuinely intended to pay the Appellee back in full, his actions demonstrated otherwise. He repeatedly promised to execute and record mortgages that would have protected the Appellee's interests and, repeatedly, he made no attempt to fulfill his obligations. Moreover, he granted subsequent mortgages on the Brookline Property without the Appellee's knowledge, thereby subordinating any interest she expected to have in the Brookline Property. Finally, after he sold the three Brookline Property condominiums, he failed to convey to the Appellee the full amount of the proceeds remaining after he paid the senior lienholders.

The Debtor argued that the Appellee released him from his obligations to execute and/or record the mortgages in question, based on the October 2007 E-mail. The bankruptcy court rejected that argument, noting that by October 2007, the Debtor had "long since shirked his obligation to execute and record the mortgages," and even if the court were to construe the e-mail as a release of the obligation to record the mortgages, it did not alter the court's finding that the Debtor's representations were false at the time he made them. The record also supports the bankruptcy court's finding that the Appellee justifiably relied on these false representations for all funds she loaned the Debtor beginning with Note B and ending in October 2007 when she discovered that the Debtor had not recorded the mortgages.

Thus, the bankruptcy court's findings and conclusions under § 523(a)(2)(A) are supported by the record.

**7.** Although the bankruptcy court also ruled that a portion of the debt owed to the Appellee was excepted from discharge on a separate basis under § 523(a)(6), the Debtor does not raise any argument relating to that ruling and, therefore, has waived it. See Perez v.

### III. The Debtor's Arguments On Appeal

The Debtor does not make any specific arguments regarding the elements for nondischargeability under § 523(a)(2)(A). Rather, he argues the following: (1) the bankruptcy court erred in ruling that any of the principal due under Note A was excepted from discharge under § 523(a)(2)(A) because he recorded a mortgage in connection with Note A; (2) the bankruptcy court erred in making new findings and amending its prior Judgment so that the remaining $128,000 of the principal due under Note A, which the bankruptcy court previously ruled was dischargeable, was now excepted from discharge under § 523(a)(2)(A); (3) the bankruptcy court erred in excepting anything from discharge under § 523(a)(2)(A) because if the Appellee had properly allocated the $250,000 Repayment to the principal balances due on Notes C, D, and E, he would not owe anything to the Appellee and there would be no basis for her claim; and (4) the Debtor challenges the bankruptcy court's findings regarding his failure to execute and record mortgages on the Brookline Property securing Notes C, D, and E.[7]

### A. The Note A Issue

The Debtor argues that the elements of § 523(a)(2)(A) were not met with respect to any of the amounts due under Note A because he executed and recorded a mortgage with respect to Note A. In support, he points to the following language in the bankruptcy court's decision:

I further find that [the Appellee] actually and justifiably relied on these false

Deutsche Bank Nat'l Trust Co. (In re Perez), 556 B.R. 527, 532 (1st Cir. BAP 2016) (citing Furness v. Wright Med. Tech., Inc. (In re Mercurio), 402 F.3d 62, 64 n.1 (1st Cir. 2005) (explaining failure to adequately brief or argue issue results in waiver)).

representations for all funds, excluding those related to the Oak Bluffs Property expenses, that she lent to [the Debtor] for the period beginning with Note B in December 2006 and ending in October 2007 when she learned the [Debtor] had not recorded the mortgages. <u>This period does not include Note A as [the Debtor] did, in fact, execute and record a mortgage for Note A.</u>

546 B.R. at 254 (emphasis added).

According to the Debtor, executing and recording the mortgage with respect to Note A was "the measure of overcoming § 523(a)(2)(A)" and the bankruptcy court's statement above shows that the elements of § 523(a)(2)(A) were not met with respect to Note A.

The Debtor misconstrues the bankruptcy court's findings and conclusions with respect to Note A. As noted above, the bankruptcy court found that the Debtor made two different false representations. The first was a false representation in September 2006 when he promised to repay the Appellee in full from proceeds of the Brookline Property condominium sales after he repaid his bank debts. The second knowingly false representation was the Debtor's promise to execute and record mortgages on the Brookline Property securing Notes B, D, and E. The court found that the Appellee justifiably relied on the second false representation for all funds she loaned the Debtor beginning with the loan evidenced by Note B. It is within this context that the bankruptcy court remarked that the period affected by the second false representation did not include the amounts loaned under Note A because the Debtor executed and recorded a mortgage with respect to Note A. In other

words, the Debtor's promise to execute and record mortgages securing the notes was not false with respect to Note A as he followed through on the promise in that instance. The Debtor's execution of a mortgage with respect to Note A does not, however, absolve him of his false promise that he would repay the Appellee in full from the sale proceeds of the Brookline Property condominiums after he satisfied his bank debt. Thus, the Debtor's argument must fail.

## B. The Amended Judgment Issue

 The Debtor also challenges the bankruptcy court's decision to amend its Judgment to include the remaining $128,000 of the principal due under Note A. He argues that, because the bankruptcy court made previous findings that the Appellee did not rely on his promise with respect to the $123,000 down payment which was incorporated into Note A, concluding that the $123,000 was dischargeable,[8] it should not have made additional findings or altered its conclusion.

 In making this argument, the Debtor does not address the law that applies to a motion to alter or amend an order of the bankruptcy court. The Appellee moved to alter or amend the judgment pursuant to Rule 59(e), which is applicable in bankruptcy pursuant to Bankruptcy Rule 9023. Rule 59(e) authorizes the filing of a written motion to alter or amend a judgment after its entry. "The motion must demonstrate the 'reason why the court should reconsider its prior decision' and 'must set forth facts or law of a strongly convincing nature' to induce the court to reverse its earlier decision." Perez

---

8. The amount at issue was actually $128,000, which consisted of prior loans in the amount of $123,000 for the down payment on the Brookline Property and another $5,000 that the Appellee loaned the Debtor in a "separate transaction." In his brief, the Debtor addresses only the $123,000 down payment.

Mujica v. FirstBank P.R. (In re Perez Mujica), 470 B.R. 251, 254 (Bankr. D.P.R. 2012) (citation omitted), aff'd, 492 B.R. 355 (D.P.R. 2013). The movant "must 'either clearly establish a manifest error of law or must present newly discovered evidence.'" Marie v. Allied Home Mortg. Corp., 402 F.3d 1, 7 n.2 (1st Cir. 2005) (quoting Pomerleau v. W. Springfield Pub. Sch., 362 F.3d 143, 146 n.2 (1st Cir. 2004)). "The party cannot use a [Rule] 59(e) motion to cure its own procedural failures or to introduce new evidence or advance arguments that could and should have been presented originally to the court." In re Perez Mujica, 470 B.R. at 254 (citation omitted).

In the Motion to Amend, the Appellee asserted the bankruptcy court erred in finding she did not rely on the Debtor's false representation that he would repay her in full from the sale proceeds of the Brookline Property condominiums with respect to the remaining $128,000 of the principal of Note A, which represented prior debts of $123,000 and $5,000, because the Appellee loaned those funds prior to the September 2006 promise. According to the Appellee, Note A replaced the obligations and terms of repayment for those earlier debts totaling $128,000, extinguishing the prior obligations and promises that the Debtor made under those earlier agreements. Thus, she alleged (1) the Debtor agreed anew to repay the $128,000 as part of the principal of Note A, with new terms, and a new due date; (2) the Debtor's execution of Note A constituted either a refinancing of the earlier debts or a renewal of credit in the amount of $128,000; and (3) the evidence showed she justifiably relied on the Debtor's promise of priority repayment when she engaged in this refinancing or renewal of credit. Therefore, she alleged, the remaining $128,000 due under Note A also fell within the § 523(a)(2)(A) exception to discharge.

As noted above, § 523(a)(2)(A) provides that debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by" a false representation is excepted from discharge. 11 U.S.C. § 523(a)(2)(A). The bankruptcy court determined that, at the hearing and in his written opposition to the Motion to Amend, the Debtor was unable to contest the evidence demonstrating that the incorporation of the $128,000 in prior loans into Note A constituted either a refinancing or a renewal of credit. The bankruptcy court then made additional findings that the Appellee relied on the Debtor's representation that he would pay her back in full, from the sale proceeds of the Brookline Property condominiums, after he paid off the banks when she agreed to such refinancing or credit renewal by incorporating this debt into Note A. As such, the court determined that the Appellee satisfied all of the elements of § 523(a)(2)(A) with respect to the entire principal due under Note A.

The bankruptcy court's additional findings are supported by the record and we conclude that the bankruptcy court did not err in entering the Amended Judgment.

### C. The Allocation Issue

██ The Debtor argues that if the Appellee had properly allocated the $250,000 Repayment to the principal balances due on Notes C, D, and E, he would not owe anything to the Appellee on those notes and there would be no basis for her claim. He contends that the $250,000 Repayment was more than sufficient to satisfy the amounts due under Note C ($30,000), Note D ($30,000), Note E ($20,000), and the $150,296 he borrowed from July 2007 to November 2007. Specifically, he challenges the Appellee's allocation of $84,704 of the $250,000 Repayment to the Debtor's share

of the Oak Bluffs Property expenses. He refers to this as "the $84,000 question."

With respect to the so-called $84,000 question, the Debtor asserts the bankruptcy court did not properly weigh the evidence regarding the Appellee's allocation of the $250,000 Repayment. According to the Debtor, the evidence established that there was no written contract which allowed the Appellee to allocate $84,704 of the $250,000 Repayment to the Debtor's share of the Oak Bluffs Property expenses. Rather, he argues, the evidence established that the Oak Bluffs Property was a completely separate endeavor and the parties had agreed that any income generated or expenses incurred with respect to the Oak Bluffs Property would be handled independently from the Brookline Property project. Thus, he claims, the Appellee should not have allocated $84,704 from the $250,000 Repayment for expenses relating to the Oak Bluffs Property and should have allocated those funds for Notes C through E, all of which related to the Brookline Property project. He also contends that, in discrediting his testimony, the bankruptcy court placed undue weight on the April 1, 2008 e-mail (wherein, shortly before making the $250,000 payment, the Debtor told the Appellee, "My debt to you will be paid in full pretty soon, starting with the May [$250,000] payment, that should put me in positive equity in [the Oak Bluffs Property] and then we should discuss the solution that will get you paid off in the best way."). Instead, he claimed, the court should have considered the totality of the evidence.

As noted above, the Appellee testified that the parties agreed to apply $84,704 of the $250,000 Repayment to the Debtor's share of the Oak Bluffs Property expenses. Although the Debtor testified to the contrary, the bankruptcy court found the Debtor was not credible on this point as

his own e-mails (including the April 1, 2008 e-mail) indicated his desire to use these funds to pay down the secured debt linked to the Oak Bluffs Property. The court credited the Appellee's testimony on this point and found that the parties agreed that $84,704 of the $250,000 would be applied to the Debtor's share of the Oak Bluffs Property expenses. Although the Debtor would have us conclude that the bankruptcy court erred in relying on the April 1, 2008 e-mail in discrediting his testimony, the bankruptcy court's view of the evidence is plausible and, therefore, cannot be clearly erroneous. See Anderson, 470 U.S. at 573–74, 105 S.Ct. 1504. Moreover, we must give great deference to the bankruptcy court's factual findings when they are based on the credibility and demeanor of witnesses. See Mission Prod. Holdings, Inc. v. Old Cold, LLC (In re Old Cold, LLC), 558 B.R. 500, 517 (1st Cir. BAP 2016) (citation omitted).

In light of the foregoing, we reject this argument.

### D. The Failure to Execute Mortgages Issue

Finally, the Debtor challenges the bankruptcy court's findings regarding his failure to execute and record mortgages on the Brookline Property securing Notes C, D, and E. He argues the bankruptcy court failed to properly consider the October 2007 E-mail (wherein the Appellee stated that they might have to wait to record a lien securing all of the unsecured debt the Debtor owed her until after the Debtor completed a refinancing of the Brookline Property). He claims this is evidence of a written modification of the mortgage clauses in Notes C, D, and E. Again, although the Debtor would have us conclude that the bankruptcy court erred by not viewing this e-mail as evidence of a written modification of the mortgage clauses in the

notes, the bankruptcy court's view of the evidence is plausible and, therefore, cannot be clearly erroneous. See Anderson, 470 U.S. at 574, 105 S.Ct. 1504. Moreover, the bankruptcy court clearly considered this argument and rejected it, holding that even if the court construed the e-mail as a written modification of the obligation to record the mortgages, it does not alter the fact that the Debtor's promises to record the mortgages were false at the time they were made. Thus, this argument must also fail.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the Amended Judgment.